UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v. Case No. 25-cr-173

MOHAMED PATEL,

Defendant.

---

# DEFENDANT PATEL'S SENTENCING MEMORANDUM

Dated: Buffalo, New York
April 20, 2026

*/s/Rodney O. Personius*
Rodney O. Personius, Esq.
PERSONIUS MELBER LLP
*Attorneys for Defendant*
MOHAMED PATEL
2100 Main Place Tower
350 Main Street
Buffalo, NY 14202
(716) 855-1050
rop@personiusmelber.com

# INTRODUCTION

Mohamed Patel has been in federal custody since his arrest at the Lewiston Bridge Port of Entry on September 11, 2024. According to the Presentence Investigation Report ("PSR"), page 1, as of his sentencing date on April 29, 2026, he will have been in custody for a period of 19 months and 17 days. Throughout, he has been incarcerated at the Allegany County Jail in Belmont, NY. As shown below, the decidedly limited opportunities for personal betterment at this facility notwithstanding, Mr. Patel has taken full advantage of what has been offered. Both during his PSR interview with Probation Officer Tina Blackmun, and in his written Offense Statement, set forth verbatim at paragraph 32 of the PSR, his demonstration of remorse and acceptance of responsibility has been compelling.

The offense of conviction suggests on its face a mine run drug offense; that is, Conspiracy to Possess with Intent to Distribute Morphine, in violation of Title 21 United States Code Sections 841(a)(1) and (b)(1)(C), and Section 846. To the contrary, this is not in any sense a traditional narcotics conspiracy case. As summarized at paragraph 13 of the PSR, the defendant has admitted that, between October 2019 and September 11, 2024, he conspired with a truck driver named Bashir Kasozi and other residents of Western New York to import commercially marketed bottles of erectile dysfunction ("ED") pills from India to the United States. Each bottle of pills was separately boxed and a number of these boxes were then packaged in a larger container. By all appearances, this product was commercially manufactured and packaged in India. Once the boxes were shipped from the JFK Airport in Queens, NY, to the Buffalo area, they were then placed in Mr. Kasozi's truck trailer and smuggled across the border, destined for Toronto, ON. Later lab analysis has determined that the pills contained poppy plant extracts, including unknown amounts of morphine and codeine. The undetermined concentration of these two substances in each pill

constitutes a critical sentencing factor because the determination under the *Sentencing Guidelines* of Mohamed's drug offense level is based upon the cumulative net weight of the seized pills without regard to the actual concentration of morphine or codeine in each capsule.

This submission also addresses the sentencing disparity that potentially exists between the expected punishment to be imposed upon the truck driver, Mr. Kasozi, and the jeopardy faced by Mr. Patel. In addition, consideration is given below to Mr. Patel's sentencing exposure based upon a straight application of the *Sentencing Guidelines*, his reduced exposure arising from recommendations made by both the United States Probation Office and United States Attorney's Office, and the additional circumstances in this case that support a further variance or departure under the *Guidelines*.

This presentation begins with a detailed treatment of the character letters that have been submitted on behalf of the defendant. Taken as a whole, they portray the sudden downfall of a beloved and respected member of the community whose extraordinary success as a cricket player lured him away from family and gainful employment into a darker world where his decision-making was singularly controlled by his addiction to gambling. As a result, the consequences for both him and his loved ones have been devastating.

Fair consideration of the facts and circumstances of this prosecution that remove it from the mainstream of standard drug cases establishes that this matter falls outside the heartland of cases to which the Sentencing Commission intends the individual *Guidelines* to apply. Beyond the recommendations of the Probation and United States Attorney’s Offices, a further variance or departure is appropriate in arriving at a sentencing outcome under Title 18 United States Code Section 3553(a) that is sufficient, but not greater than necessary, to meet the federal sentencing goals set forth in that statute.

## I. CHARACTER LETTERS

Annexed to this submission as **<u>Exhibit A</u>** are 16 character letters prepared by family members and friends of Mr. Patel. As demonstrated below, these letters portray Mohamed as devoted to his family. He is known for his kindness, patience and thoughtfulness. On countless occasions, Mr. Patel has helped others in need. His absence over the past 19 plus months has presented challenges for both his wife and two children. These letters also demonstrate that he has expressed both remorse and acceptance of responsibility for his wrongful conduct.

The provided letters have been placed alphabetically in the following order for ease of reference:

1. Asif Adam
2. Asad Bhikhu
3. Nicole Boikovits
4. Sarfarcz Kara
5. Husain Patel
6. Ibrahim Patel
7. Rafiq Patel
8. Salma Patel
9. Samina Patel
10. Shabbir Patel
11. Soeb Patel
12. Sumaiyabanu Patel
13. Varsha Patel
14. Zabir Patel

15. Javed Varachhia

16. Zakirhussain Vohra

**A. <u>Devotion to Family</u>**

In her character letter, Asad Bhikhu characterizes Mohamed as a "devoted family man." In a similar fashion, Sarfarcz Kara remarks that "being a father means everything to him."

The thoughts of Mr. Patel's son, Ibrahim, attest to his love and respect for his father. He describes Mohamed as a "steadfast source of guidance and support." When Ibrahim experienced issues with his homework, Mr. Patel would stay up late to work with him. He "instilled in [Ibrahim] the values of hard work, responsibility, and treating others with respect." Like his father, Ibrahim is an accomplished cricket player. As recounted by Ibrahim, Mr. Patel "coached me, attended my matches, and celebrated my achievements as if they were his own." His father placed family first. In summary, Ibrahim explains that Mohamed "leads through patience, support without judgment, and love without conditions." He "shows up for us every single day."

Mohamed's sister, Samina, observes that her brother "values family deeply."

Shabbir Patel, a friend and co-worker, offers the following: "What stands out most about Mohamed is how much he loves his children, especially his daughter Allyah. He would often share stories about his family, showing just how important they are to him." When they drove over the road together as truckers, Shabbir Patel recalls that Mohamed "would call home to check on his children, talk about what they needed, and planned his time around being present for them whenever he was back in Canada."

Soeb Patel is the defendant's brother. "Mohamed is not just my brother. He is the father I never had." Soeb is referring to a period of time in and around 2003 when their parents had traveled to India to care for their own parents. At that time, Soeb was 16 years old. Mohamed's sister, Samina, was then 13 years old. He took over responsibility for raising both of them. "In that moment, Mohamed became everything to us." There was then a brief period when Mohamed had to travel to India to help with the care of his grandparents. Upon returning to Canada with his new wife and infant son, they without hesitation took both Soeb and Samina into their home for the period 2008 through 2016. Soeb recounts that Mr. Patel was the sole bread winner for the extended family, working nights at a job that involved injection molding. Soeb, based upon this experience, has always looked up to Mohamed: "When I was lost, he was my compass. When I was confused about the future, he showed me the way. When I was scared, he was my strength." Speaking for both himself and his sister, both learned through Mr. Patel's generosity "what it means to put family first."

Mr. Patel's wife, Sumaiyabanu, portrays her husband in a similar light. In her eyes, he is an "honest, caring and hard-working husband and father." She recalls having suffered in 2021 from severe vertigo. In order to attend to her medical needs, as well as managing the household, Mr. Patel took off several weeks of work. At no point did he ever complain. In 2022, after Sumaiyabanu's father had passed away in India, Mohamed didn't hesitate to assume full responsibility for the needs of his mother-in-law. Sumaiyabanu states that this is "simply who Mohamed was." In terms of their children, she proudly states that their son, Ibrahim, plays cricket at the provincial level solely as the result of the time expended by Mohamed in working with him.

In the case of their daughter, Allyah, "Mohamed always treated her like a princess, gentle and soft-spoken even when she made mistakes."[1]

Varsha Patel has been a friend of Mr. Patel's wife since 2016. As a result of this relationship, she has had regular contact with Mohamed. She characterizes him as "a devoted husband and father who loves his family deeply." Zakirhussain Vohra is Mr. Patel's brother-in-law. They have known one another for approximately 15 years. He comments that "Mohamed is deeply devoted to his wife and children and takes his responsibilities as a husband and father very seriously." He states that Mr. Patel manages home tasks, supports his children's activities, and ensures their needs are met.

**B. Reputation**

Asif Adam has been a friend of Mohamed since 2010. Referring to how Mr. Patel is perceived among his cricket and volleyball teammates, Mr. Adam shares that he is "widely admired for his sportsmanship and positive attitude." Asad Bhikhu is another fellow cricket player, who reveals that the defendant is a "disciplined and respectful sportsman."

Nicole Boykovitis has known Mohamed since the seventh grade. They grew up in the same neighborhood. She uses the words "kindness, integrity and determination" to characterize Mr. Patel. She operates a salon in the Toronto area. Customers who have met Mr. Patel in that context will later ask about him when they return to the salon.

Sarfarcz Kara is another fellow cricket player. He has known Mohamed since 2012. Within the Toronto cricket community, Mr. Patel is known as "honest, trustworthy, and available when you need support." Husain Patel is a cousin. In his mind, the defendant's character is defined by "compassion, loyalty, and genuine care."

[1] Due to her age, a character letter was not requested from Allyah.

Mohamed's father is Rafiq Patel. He proudly reports that "Mohamed has always carried himself with respect and calmness, even in challenging situations." He "handles conflicts with patience and thoughtfulness." Mohamed's mother offers a similar assessment, stating that her son "possesses a gentle and patient nature that defines who he is." His sister, Samina Patel, offers a strikingly similar assessment: "He is patient, respectful, and someone who puts the needs of others before his own." "He is well liked and trusted in his own community because he cares, listens, and always tries to do the right thing."

Shabbir Patel, the fellow truck driver of 10 years, reports that "Mohamed is a hard worker and dependable in a way you can measure." When they would travel together on over-the-road trips, Mr. Patel was prepared and organized, but "would still take time to check on others."

The defendant's brother, Soeb, describes his older brother's character as follows: "He brings joy to rooms. He brings lightness even during difficult times. This is who Mohamed is at his core: someone who uses humor and kindness to make people around him feel less alone." Varsha Patel, the long-time friend of Mr. Patel's wife, states that she has "come to know Mohamed as a kind, respectful, and hardworking person." "His caring nature and dependability have always stood out to me."

Zabir Patel, a friend of 15 years, states that Mohamed "consistently demonstrated qualities of reliability and compassion." Fellow cricket player, Javed Varachhia, first refers to Mohamed's "strong work ethic," before continuing by referring to his "team first mentality where he would often sacrifice his own accolades if it meant the team could succeed." He states that his friend's "compassion and generosity is what truly stand out." "I have always been impressed by Mohamed's humility and kindness, even when facing difficulties." Mr. Patel's

brother-in-law, Zakirhussain Vohra, also has a high opinion of Mr. Patel, portraying him as a "kindhearted, generous, and family oriented person."

### C. Anecdotal Illustrations

Asif Adam recalls arriving in Canada from the United Kingdom in 2008. He states that Mr. Patel is "trusted and admired for his integrity and dedication to helping others." In his own experience, after arriving in Canada, Mohamed offered him a "sense of family and cultural connection." When Mr. Adam opened a newspaper business, without expectation of remuneration, Mr. Patel would help with his deliveries on his days off from his regular employment. In a similar fashion, fellow cricket player Assad Bhikhu, states that Mr. Patel "checks in on people when they are going through difficulties."

His neighbor dating back to junior high school, Nicole Boikovitis, uses almost the same description, recounting that Mr. Patel is "a source of support during difficult times." For her part, she remembers being in the seventh grade. Not wanting her to walk home from school alone, Mohamed would wait outside so that they could return home together. She also reports that, when she was in the midst of an abusive relationship, he helped her escape in the middle of the night. As well, when her father passed away, Mr. Patel became a big brother, which included assisting her mother with shoveling and mowing at their home.

Another of his cricket teammates, Sarfarcz Kara, reports that Mohamed was "always willing to help." This included arranging matches, coordinating rides for players, and providing advice.

As mentioned above, there was a period when Mr. Patel went to India to assist his parents with caring for his ill grandfather. His father, Rafiq, recalls that his son would help with medications and doctor appointments. He states that Mohamed was a "steady, calming presence

we all leaned on." The defendant's mother, Salma, recounts that Mohamed "has consistently shown kindness to others." He "helps others without being asked." She recalls a 2007 flood in India that paralyzed the community. Mohamed devised a pulley system using ropes that was used to send food, water and supplies to affected families, as well as local mosques. In her mind: "This is the true measure of his character, not what he says, but what he does for those in need."

His sister, Samina, describes another example of Mohamed's extraordinary actions. During COVID, her husband was in India, leaving Samina alone in Toronto with her 3-year-old son. Mohamed "did all of my groceries, made sure I had everything I needed." He "made sure we were safe and taken care of." In 2009, brother Soeb had lost his job. Mr. Patel used his contacts to help Soeb gain employment at IBM. This opportunity "became the foundation for everything I've built since." He affectionately refers to his brother as "a man who has spent his entire adult life caring for others."

Mr. Patel's wife, Sumaiyabanu, describes two additional acts of generosity on the part of her husband. Until his arrest, he sponsored a female in India who was pursuing a nursing degree, paying her monthly tuition. Unfortunately, upon his arrest, she had to drop out of school. He also had a practice of making weekly donations to the local mosque to support the needy. His wife's close friend, Varsha Patel, a single mother, also recollects that Mohamed assisted her son in finding a suitable used car.

Summarizing all of these good works, his friend of 15 years, Zakir Patel, makes the following observation: "He is someone who treats people with respect and is always willing to lend a helping hand when needed." Javed Varachhia, Mohamed's fellow cricket player, recounts starting his own cricket team in 2016. Mr. Patel was not only a key player on the team, "he

quietly covered practice fees and equipment costs for players who could not afford them so they would not be left out nor feel embarrassed."

Finally, Mohamed's brother-in-law recollects that when he and Mohamed's sister landed in Canada in 2023, the defendant opened his home to them for a period of two months. He helped Mr. Vohra find a job and their own place to live. He also assisted them in opening a bank account, finding a cell phone plan, and even driving them to Service Ontario. On a wholly separate note, he also recollects instances when Mr. Patel, enroute to the mosque, would stop to offer a ride to individuals walking in that direction.

**D. <u>Effect of Absence Upon Family</u>**

Perhaps not surprisingly, the Patel family has suffered immensely due to Mohamed's arrest and incarceration over the past 20 months. Son Ibrahim reports that, on his 18th birthday on April 7, 2025, "my father's absence made that day painfully empty." He states that this represented the first occasion when his father "was not there" for him. In his words, "there is no substitute for my father's presence." "Our home has lost the warmth, stability, and sense of security that he provided every single day." Ibrahim has observed his mother struggling in an effort to balance her work obligations with managing the family. In addition to himself losing a mentor as he approaches adulthood, Ibrahim reports that his 15-year-old sister has lost the protective presence of her father.

Brother Soeb summarizes the effect of Mohamed's absence as follows: "The absence of Mohamed has left a void in our family that cannot be filled by anyone else." Mr. Patel's wife, Sumaiyabanu, pointedly states that "our family has collapsed." They lost their home at a "huge financial loss," as well as their vehicle. She is now required to work at a full-time job, leaving little quality time to spend with her children. Ibrahim takes a bus to college each day, which is

an approximate 1 ½ to 2 hour commute. He also is working part time. Allyah has to take a 45-minute bus ride of her own to and from school. Varsha Patel, and Mohamed's fellow cricket player Javed Varachhia, confirm having observed the challenges faced by Mohamed's immediate family.

**E. <u>Remorse and Acceptance of Responsibility</u>**

Members of Mr. Patel's family confirm his remorse for his misconduct, as well as his full acceptance of responsibility for his actions. His father, Rafiq, reports the following: "From our conversations, I know he deeply regrets what happened and the harm it caused to his family and others." Mohamed's sister, Samina, affirms the same as a result of her contacts with the defendant: "He has expressed sincere remorse to me for the pain and worry this has caused. Mohamed takes responsibility for his actions and wants to do whatever he can to make things right and grow from this experience." In similar fashion, brother Soeb states as follows: "He has taken full responsibility for his actions, and there is no doubt in my mind that his remorse is genuine and profound."

***

Mohamed's brother, Soeb, concludes his own letter with the following request, which captures the essence of the attestations of Mohamed Patel's character and reputation set forth above:

> I am asking the Court to consider Mohamed's lifetime of character alongside this one serious instance of unlawful actions. I am asking that you see him not only as a defendant in this case, but as a son who cared for his aging parents, as a husband who supported his wife through hardship, as a father who coached his son to achieve provincial-level athletic success, as an uncle who inspired his niece and nephew, as a brother whose love and support

> gave my sister and me a foundation upon which to build our lives.
>
> My sister needs her big brother back. My wife needs her friend back. My children neither uncle back and to remember what unconditional love actually looks like. In addition, I need the man who was my father figure to come home and rebuild his relationship with the family that loves him and forgives him.

## II. MOHAMED PATEL'S SENTENCING EXPOSURE

The PSR, paragraph 44, finds that a straightforward application of the *Guidelines'* rules gives rise to an offense level of 31. Paragraph 48 reflects that the defendant's Criminal History Category is I. Based upon these calculations, paragraph 53 of the PSR assigns Mr. Patel a sentencing range of 108 to 135 months incarceration.

In recognition, however, of a number of circumstances that make the sentencing determination in this case unique, the PSR provides as follows at paragraph 93:

> In formulating a reasonable sentence, the Court may consider that the defendant has no prior criminal history, has made efforts to rehabilitate and better himself by completing coursework while in custody, has demonstrated genuine remorse over his actions and the harm that resulted. Further, the Court may take into account the defendant's gambling addiction and its role in the defendant's motivation for committing the instant offense, and his relatively stable history of employment.

In a formal Sentencing Recommendation, United States Probation Officer Blackman had originally recommended a variance from the sentencing range set forth at paragraph 53 of the PSR. In particular, the recommendation that had been made was a 24-month variance to a recommended sentence of 84 months imprisonment. If this recommendation had been accepted

by the Court, this would have placed Mr. Patel's sentencing range at level 27 under the *Guidelines*, which provides for a sentence in the range of 70 to 87 months incarceration. Apparently, this 24-month reduction had been made without considering the separate request by the government that Mr. Patel receive a 2 level reduction under the *Guidelines*. Under U.S. Probation's original recommendation, combined with the government's request, the defendant's offense level under the *Guidelines* would have been 25, leading to a sentencing range of 57 to 71 months imprisonment.

Instead, the Probation Office has revised its recommendation in consideration of the government's request and now advocates for a sentence reduction of 15 months rather than 24 months. No explanation is provided for this change in position, which in practical terms penalizes the defendant for the effect of the government's independently based application. We recognize the reduction recommended by U.S. Probation is discretionary, but ask the Court in the interest of fairness to act upon that office's original 24-month recommendation.

Below, additional factors are addressed that take Mr. Patel's case further from the heartland of cases taken into consideration by the Sentencing Commission in its formulation of the *Guideline* rules that apply in this case. Based upon the above, it is our respectful request that the Court's consideration of these additional factors begin at the range of imprisonment identified above as a result of the original recommendation made by the Probation Office and United States Attorney's Office's further request for a sentencing reduction.

## III. THE OFFENSE CONDUCT FALLS WELL OUTSIDE THE HEARTLAND

In a broad sense, there are two circumstances associated with the conduct underlying the offenses of conviction that warrant consideration as part of a heartland analysis.

The first factor, touched upon in the Introduction, relates to how the morphine, which is the driving determinant of a traditional application of the *Sentencing Guidelines,* should be applied in this case. In particular, morphine is a constituent ingredient of pills commercially marketed in India as a treatment for erectile dysfunction. Attached as **Exhibit B** are photographs that depict the fashion in which these pills are packaged. The first provided photograph includes the box in which each bottle of pills is packaged. This labeling refers to the product being marketed as "MEDICINE." The second provided photograph of one side of this box refers to the supplier of the product – "*Multani* Pharmaceuticals Limited," an established commercial business that operates in India.

Returning to the first photograph, it also depicts the bottle containing the pills and a sample pill. Once more, the name of the supplier, *Multani*, is prominent on the bottle. The third provided photograph is a close-up of the bottle's label, setting forth the ingredients. Of particular relevance is the reference in the ingredients to the following: "Suddha Ahiphena (*Papaver Somniferum)* (Fr. Exd.) 80 mg, Processed in Water Q.S." The last provided photograph is a copy of the insert contained in the box in which the pill bottle is packaged. It again refers to the manufacturer as well as the ingredients, including that quoted above.

This particular ingredient, Suddha Ahiphena, is a reference to the poppy plant and is the ingredient within each pill that is responsible for the presence of morphine and codeine. As will be explained below, the concentration of either controlled substance in any given pill is unknown. For the purpose of the first point being made, both the packaging of these pills and the description of their ingredients in no fashion suggests clandestine drug activity nor, for that matter, the fact these pills contain a controlled substance. For his part, Mohamed acknowledges having

reason to believe this product contained an illegal substance, but had no knowledge as to the exact identity of that substance or its concentration.

The second important consideration from a heartland prospective is the complete absence of any reliable indication as to the actual concentration of morphine (or codeine) in any given pill that was seized as part of the underlying investigation. Annexed as **Exhibit C** is a sample Laboratory Report, showing a Received date of 08/05/2024 and a Reported date of 10/10/2024. While the analysis identifies the presence of both morphine and codeine, no information as to concentration or purity is provided.

As noted, the source of the morphine and codeine found in the ED pills at issue is the use of extracts from the poppy plant as an ingredient. There is, however, no reliable means of determining the actual amount of either substance in any pill. Annexed as **Exhibit D** are three articles that address this fact. The first is a Food and Drug Administration January 15, 2025 report captioned Growing, Harvesting, Processing, and Distribution of Poppy Seeds – Industry Practices Related to Opiate Alkaloid; Request for Information. On the second page of this report, the following statement is made: "The scientific literature and FDA's preliminary surveillance sampling show that poppy seeds may have varying amounts of opiate alkaloids [.]" The reported variation in morphine levels is marked, as demonstrated by the following comment at the bottom of the second and top of the third page: "Twenty-one samples taken from poppy seeds purchased online show morphine levels between 1 mg per kilogram (mg/kg) and 520 mg/kg (median 70 mg/kg; mean 120.4 mg/kg) and codeine levels between 0.8 mg/kg and 255 mg/kg (median 85 mg/kg; mean 113.1 mg/kg)." The extracted morphine concentration can be as minute as 1 mg and the variation as great as 500 time between extractions. Also on the third page, the report states the following: "As background, a poppy plant's production of opiate alkaloids varies based on certain

environmental, biological, and inter-cultivar genetic variation. In addition, we are aware that agricultural practices that occurred during poppy plant growth may impact opportunities for opiate alkaloid - containing latex to be deposited and seeds (Refs. 2-5 and 9)."

The second article included as part of **Exhibit D** is taken from a publication entitled Biology and is dated April 27, 2022. The specific article that is provided is titled Forensic Application of Genetic and Toxicological Analyses for the Identification and Characterization of the Opium Poppy (*Papaversomniferum* L.) The second page of this article makes the following statement regarding the morphine purity issue:

> This variation in morphine concentration may occur due to losses related to leeching, the fungal and enzymatic degradation of alkaloids, or wet and cold weather during maturation. The variability of the alkaloid content in the opium poppy depends on several factors, such as its region of origin, climate conditions (e.g., temperature, light conditions), plant cultivar, vegetation stage, and the different plant parts examined (the stem diameter, peduncle length, and plant height). Changes in the content of alkaloids are also derived from capsules' sizes, the status of conservation (dry or fresh), the presence of seeds or incisions, and the number of incisions made to extract the opium.

[Citation references omitted.] Later on its second page, the article states: “The morphine percentage in opium ranges considerably (from 3% to 30%) across countries, unlike its content in dry poppy capsules, which remains practically unchanged (from 0.2% to 1%).” [Citation omitted.]

The third provided article is taken from a publication named Frontiers in Chemistry and is dated August 27, 2020. The title of this article is Opium Alkaloids in Harvested and Normally Processed Poppy Seeds. On Page 2, this article states:

> Harvesting methods had been shown to greatly affect the level of alkaloids in the final opium product. If the opium is harvested too early in the process the product is found to be watery and if too late the opium contains significantly lower levels of alkaloids.

[Citations omitted.]

On page 5 of the article, Table 7 sets forth the range and mean weight of alkaloids in poppy seeds, showing a range of 29,652 ng/g to 62 ng/g (as well as " not determined). On page 6, the article explains that, with respect to the findings in Table 7, "it was found that there was much variation within batch but also between sources of poppy seeds." "There is much variation in the extracted opiate compounds, which is primarily due to the environmental differences of the seeds (citation)."

*Id.*

Expanding upon this comment, the article states at page 7:

> It has been known since 1920 that factors, such as the season in which the plants are grown, weather conditions, and quality and type of fertilizer used can greatly affect the levels of alkaloids biosynthesized in *Papaver Somniferum L.* In turn, the levels of alkaloids found in opium latex will also be affected. No data currently exists that compares levels of alkaloids and opium latex and alkaloids from the same plant but it is assumed that the levels would correlate. On this basis, the country of origin where the plant was grown in the field (e.g., in the shade or direct sunlight) and the quality of the soil can all affect the levels of alkaloids in the poppy seeds. This means that if a batch of poppy seeds

> is harvested from one field, naturally there will be variation in the levels of alkaloids from each of the plants.

What is shown by all of these authorities is that there is no reliable means of predicting the concentration of morphine in any opium extract used as an ingredient in another product, such as the ED pills seized in this case. Indeed, the Ninth Circuit has specifically identified the issue of purity as a basis for a variance under the *Guidelines*:

> First, purity or dilution is a relevant consideration for crafting a sentence that is "sufficient, but not greater than necessary," under Section 3553(a). Just as an upward variance or departure may be justified based on the unusually high purity of a drug, *see* U.S.S.G. Section 2D1.1 cmt. n. 26(C), a downward variance for a mixture of unusually low purity may be justified in appropriate circumstances to better reflect the nature and seriousness of the offense, *see* 18 U.S.C. Section 3553(a)(1)-(2).

*United States v. Stewart*, 761 F3d 993, 1001 (9th Cir. 2014).

In the present case, the Plea Agreement at paragraph (i) provides that the total net weight of the seized pills is 127.02 kg. Pursuant to *Guidelines* Section 2D1.1 app. note (8)(D), opiates are treated under the Drug Conversion Table as follows: 1g of morphine is the equivalent of 500 g of marijuana. As such, the drug weight of the pills at issue requires that the net weight of 127.02 kg be multiplied by 500, resulting in a drug weight of 63,510 kg. As reflected in paragraph 6 of the Plea Agreement, pursuant to the Drug Quantity Table found at *Guidelines* Section 2D1.1(c), this converted drug weight falls between 30,000 and 90,000 kg, resulting in an offense level of 36. This same finding is reflected at paragraph 34 of the PSR. Of note, the highest drug level under the *Guidelines* is 38, meaning that the pills recovered in this case, all with an unknown

concentration of morphine or codeine, are being treated under the *Guidelines* as falling under the second-highest controlled substance offense level due to a rigid application of the Drug Conversion and Drug Quantity rules.

It is through the application of these provisions of the *Guidelines* that the PSR, starting with a base offense level at paragraph numbered 34 of 36, ends with a total offense level of 31 at paragraph numbered 44. In turn, this calculation, along with an assigned Criminal History Category of I leads to finding Mr. Patel is subject to a Guideline imprisonment range of 108 months to 135 months. The fact the pills containing the morphine seized in this case were commercially packaged without any notice of the presence of morphine, coupled with the fact the concentration of morphine in any given pill absolutely cannot be determined, conclusively demonstrates that Mr. Patel's case lies outside the heartland of more traditional drug cases that were relied upon in formulating the calculations outlined above. In this instance, the starting point for a sentence that is sufficient but not greater than necessary to meet the goals of federal sentencing should not begin at level 31, not anywhere near that level.

## IV. SENTENCE DISPARITY

The related case to the prosecution of Mr. Patel is captioned *United States v. Kasozi*, 25-cr-00067-LJV-1. According to the docket sheet, Bashir Kasozi first appeared in court on August 24, 2024. He entered a plea of guilty on May 6, 2025. On that date, he was released from custody without opposition on the part of the prosecution back to Canada, meaning he spent less than 8 1/2 months in jail. Currently, his sentencing date has been adjourned pending resolution of the prosecution against Mr. Patel. The inference to be drawn from Mr. Kasozi’s unopposed release

at the time of his guilty plea, absent any release conditions due to the fact he is a resident of a different country, is that his eventual sentence will consist of time served.

By comparison, Mohamed Patel has already served over 19 months in jail, which is almost 2 1/2 times greater than Mr. Kasozi's detention. It is acknowledged that Mohamed Patel is more culpable than Bashir Kasozi. However, in fashioning a sentence in this case that is sufficient but not greater than necessary, consideration must be given to the expected outcome of the *Kasozi* case, resulting in a period of incarceration of less than 8 1/2 months.

## V. MISCELLANEOUS SENTENCING CONSIDERATIONS

Below are listed eight additional circumstances that weigh in favor of imposing a lenient sentence upon Mohamed Patel. The ninth consideration has already been addressed above, which is the extraordinary set of character letters (**Exhibit A**) that have been submitted on his behalf. These additional considerations follow.

The first five factors are the basis for the recommendation by the Probation Office that there be a 15 to 24-month reduction in Mohamed's sentence as compared to the range of 108 to 135 months resulting from a rote *Guidelines* calculation. We respectfully request that even greater weight be attributed to these five factors. They are as follows:

1. **No Criminal History**

2. **Rehabilitation While in Custody:**

The PSR, at paragraph 79, refers to Mr. Patel's rehabilitation while detained at the Allegany County Jail for the past 19 months. While the PSR, at paragraph 79, refers to the completion of 80 courses and 211 hours of coursework, updated information is included as **Exhibit E**. The more

current information is that the defendant has completed 96 courses involving a total of 313 learning hours and 268 course hours. These courses have covered a vast array of subjects, including substance abuse, conflict management, human relationships, handling stressors, parenting, morality, meditation, and psychotherapy. In light of the limited resources available to the defendant, his commitment to maximizing what was available, and successfully completing all of these courses, warrants consideration as taking steps to rehabilitate, which is discussed further below at item 8 under the heading **Local Custody**.

3. **General Remorse:**

The offense statement prepared by Mr. Patel is set forth verbatim at paragraph 32 of the PSR. It embodies yet another instance when a high achieving, well-respected individual has fallen victim to *hubris*. In Mohamed's case, the cause of his undoing was his superior athletic skill at the game of cricket. After accepting the opportunity to play cricket for money in 2016, Mohamed became drawn into the glamorous life of a professional cricket player, which included not only being compensated, but also, as he describes it, "regular drinking, clubbing, and eventually gambling. My first visit to a casino changed my entire life. From that night, I quickly became addicted and it took over my life." PSR paragraph 32. He continues his statement by describing his downfall, which resulted in engaging in the criminal conduct at issue to support his craving for money needed in turn to support his ever-consuming gambling habit. The sincerity of his closing remarks about now understanding what matters, will have to be evaluated by the Court; however, the repeated positive statements about his character articulated in the many letters submitted on his behalf weigh heavily in favor of a finding of authenticity as to the entirety of his offense statement.

Directly relevant to this assessment is the following statement set forth in the character letter of Javed Varachhia, included in **Exhibit A**, referring to the "old" Mohamed Patel before his fall from grace:

> I've also noticed that Mohamed is also a devoted husband and father. The cricket ground often serves as a place for young men to get away from their families – an escape from their day-to-day lives and obligations. But Mohamed did not see it that way. I often saw him and his young son spend entire days at cricket matches, where he would mentor him about the game with excitement, always emphasizing fair play and discipline. His wife and daughter would frequently come to drop off food and snacks for Mohamed and their son, showing their close family bond.

This statement embodies the lifestyle Mr. Patel will return to upon his release.

4. **Addiction to Gambling:**

This topic is addressed above in Item #3.

5. **Stable Employment History:**

Mohamed's past employment is outlined at paragraphs 81 and 82 of the PSR. From July 2008 through November 2016, he worked as a foreman at Silgam Plastics in Scarborough, ON. He then opened his own over-the-road trucking business through a company named 2552139 Ontario Inc. He continued in this business from 2016 until his arrest in September 2024.

6. **Rehabilitation:**

The Second Circuit has recognized the importance of rehabilitation as a circumstance which may form the basis for a departure, and support the conclusion a particular case falls outside the *Guidelines* heartland. *United States v. Core*, 125 F.3d 74, 76-77 (2d Cir. 1997), citing *United States v. Maier,* 975 F.2d 944, 948 (2d Cir. 1992). In *United States v. Normandeau,* 63 Fed. Appx. 573, 576 (2d. Cir. 2003) [not selected for publication], the Court commented as follows regarding volunteer work in the custodial setting: "We reject the assertion that evidence of a defendant's volunteer work (particularly where, as here, it involves 10-12 hours of work per day) is irrelevant to the extraordinary rehabilitation analysis."

**7. Financial Setbacks:**

As set forth in the PSR at paragraph 10, Mr. Patel has agreed to forfeit seized funds of $7,365.00. Paragraph 87 refers to his loss of a vehicle, paragraph 88 to the loss of the family's residence, and paragraph 89 to the loss of his truck tractor.

**8. Local Custody:**

As set forth in the PSR at page 1, and as reported above, Mr. Patel has now spent more than 19 months in custody. It is beyond argument that the "local time" experience makes each passing day seem longer mentally and emotionally than the equivalent amount of time spent in Bureau of Prisons custody. The principal reasons this is true are because of the absolute lack of activities, the more cloistered environment, and fewer opportunities for self-improvement at a local county jail as compared to being in the custody of the Bureau of Prisons. In addition, while in local custody, a defendant is not eligible for the credits toward an earlier release date made

available through the First Step Act, Title 18 United States Code Section 3632. Pursuant to subparagraph (d)(4) of the statute, 10 days of time credits can be earned for 30 days of successful participation in "evidence-based recidivism reduction programming or productive activities." In the case of Mohammed, as an example, had he been in BOP custody just for the past year and participated in these program activities, he could have reduced his eventual sentence by four months.

## CONCLUSION

As demonstrated above, Mr. Patel's case lies outside the heartland of cases forming the basis for the onerous drug-related *Guidelines* provisions that have been applied in calculating his final offense level and proposed term of imprisonment of 108 to 135 months. The facts do not disclose anything close to a traditional drug smuggling conspiracy. The pills containing the morphine used to calculate Mohamed's offense level applying the *Guidelines'* Drug Conversion and Drug Quantity Tables constitute the height of unfairness. The net weight of pills containing an unknown concentration of morphine have been multiplied by a factor of 500 to arrive at a *Guidelines* drug weight of 63,510 kg. These commercially produced pills, contained in labeled bottles inside labeled boxes have been used to arrive at an offense level of 36, which is the second highest level applicable to any drug offense. Even with the recommendations proposed by the Probation Office and Government being acted upon, a sentence of 6 years imprisonment under the facts of this case is grossly unfair.

Added to these circumstances is the fact Mr. Patel's charged co-conspirator, although concededly less culpable, is already out of jail after having served a sentence of only 8 months incarceration. The other compelling factors in this case include Mr. Patel's strong character and lifetime of good works, his extraordinary expression of remorse and acceptance of responsibility,

the fact a gambling addiction represented the trigger point for his unlawful conduct, his service of strictly local time to date, his rehabilitation while in custody, and the struggles of his family during the period of his absence. As long as he is away, those struggles will continue.

Taking all of the points identified in this submission into consideration, our respectful request is that the Court impose a sentence upon Mohamed Patel of time served as sufficient, but not greater than necessary, to meet the goals of federal sentencing set forth in Section 3533(a).

Respectfully submitted,

*/s/Rodney O. Personius*
Rodney O. Personius, Esq.
PERSONIUS MELBER LLP
*Attorneys for Defendant*
MOHAMED PATEL
2100 Main Place Tower
350 Main Street
Buffalo, NY 14202
(716) 855-1050
rop@personiusmelber.com